**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Larry Dawson,<br><br>    Plaintiff,<br><br>vs.<br><br>AKAL Security, Inc.,<br><br>    Defendant. | No. CV 11-00420-PHX-NVW<br><br>**ORDER** |

Before the Court are Defendant AKAL Security, Inc.'s Motion for Summary Judgment (Doc. 15) and separate statement of facts (Doc. 15-1), Plaintiff Larry Dawson's response (Doc. 16) and statement of facts (Doc. 17), and AKAL's reply (Doc. 18).

LRCiv 56.1 requires any party filing a motion for summary judgment to file a separate statement of facts supporting the motion, each of which refers to a specific admissible portion of the record where the fact finds support. The rule requires any party opposing the motion to file a statement responding to each paragraph of the moving party's statement of facts and presenting any additional facts that establish a genuine issue of material fact or otherwise preclude judgment in favor of the moving party. For each disputed fact and each additional fact, the opposing party must refer to a specific admissible portion of the record where the opposing party's position finds support. LRCiv 56.1(b). Dawson's additional statements of fact are not supported by admissible evidence as required by LRCiv 56.1(b), and most of Dawson's comments responding to

1 AKAL's statement of facts do not refer to the specific admissible portion of the record
2 supporting his position.  Therefore, only Dawson's statements supported by admissible
3 evidence, *i.e.*, AKAL's exhibits attached to the Declaration of Janet Gunn (Doc. 15-3),
4 are considered in deciding this motion for summary judgment.  *See* Fed. R. Civ. P. 56(e)
5 (if a party fails to properly support an assertion of fact, the court may consider the fact
6 undisputed for purposes of the motion).

7 In addition, AKAL filed a response to Dawson's statement of facts (Doc. 19).
8 LRCiv 56.1 permits the moving party to file a reply memoranda, but does not permit the
9 moving party to file a separate response to the opposing party's statement of facts.  Thus,
10 any evidentiary objections to the opposing party's statement of facts must be made within
11 the reply memoranda.  AKAL's response to Dawson's statement of facts (Doc. 19) will
12 therefore be stricken, and the Court does not consider it in deciding the motion for
13 summary judgment.

14 Finally, AKAL's request for judicial notice of Dawson's Complaint filed in this
15 action is unnecessary and is not construed to be a motion.

16 **I.    Legal Standard**

17 Summary judgment is proper if the evidence shows there is no genuine issue as to
18 any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R.
19 Civ. P. 56(c).  The moving party must produce evidence and show there is no genuine
20 issue of material fact.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d
21 1099, 1102 (9th Cir. 2000).  If the burden of persuasion at trial would be on the
22 nonmoving party, the party moving for summary judgment may carry its initial burden of
23 production under Rule 56(c) by producing "evidence negating an essential element of the
24 nonmoving party's case," or by showing, after suitable discovery, that the "nonmoving
25 party does not have enough evidence of an essential element of its claim or defense to
26 carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz*
27 *Cos.*, 210 F.3d 1099, 1105-06 (9th Cir. 2000); *High Tech Gays v. Defense Indus. Sec.*
28 *Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990).

1  The party seeking summary judgment bears the initial burden of identifying the
2  basis for its motion and those portions of the pleadings, depositions, answers to
3  interrogatories, and admissions on file, together with the affidavits, if any, which
4  demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*,
5  477 U.S. 317, 323 (1986).  When the moving party has carried its burden, the nonmoving
6  party must produce evidence to support its claim or defense by more than simply showing
7  "there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*
8  *v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To defeat a motion for summary
9  judgment, the nonmoving party must show that there are genuine issues of material fact.
10 *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

11 On summary judgment, the nonmoving party's evidence is presumed true, and all
12 inferences from the evidence are drawn in the light most favorable to the nonmoving
13 party. *Eisenberg v. Ins. Co. of North America*, 815 F.2d 1285, 1289 (9th Cir. 1987);
14 *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1117 (9th Cir. 2001).  But the evidence
15 presented by the parties must be admissible.  LRCiv 56.1(a), (b); *see* Fed. R. Civ. P.
16 56(e).  Conclusory and speculative testimony in affidavits and moving papers is
17 insufficient to raise genuine issues of fact and to defeat summary judgment. *Thornhill*
18 *Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

19 **II.    Background**

20 Dawson was employed by AKAL Security, Inc., from February 2009 until October
21 2010 as an armed security guard.  AKAL is a private security company that provides
22 security services to the federal government throughout the United States.  In April 2001,
23 the U.S. Immigration and Customs Enforcement ("ICE") contracted with AKAL to
24 provide security services at the Florence Processing Center in Florence, Arizona.
25 Through its contract with ICE, AKAL provides 24 hours a day, 7 days a week, security
26 for the illegal immigrants who are housed at the Florence Processing Center.  AKAL's
27 custody officers are responsible for the security, care, and supervision of detainees and of
28 the facility.

The contract between ICE and AKAL provides:

> [AKAL] shall fully staff the facility to secure, control, and supervise detainees in custody regardless of the detainee population. Staffing must be sufficient to cover the posts as listed in the solicitation. [AKAL] shall ensure daily Custody Officer assignment rosters, by shift, for the duration of the contract. The assignment rosters shall indicate the number of staff, job titles, names, hours, and days of work for each post. The daily roster shall be posted 24 hours in advance. Shift rosters must be provided to the [Contracting Officer's Technical Representative] on a daily basis upon completion of the third shift.

The contract requires that AKAL assign only employees who are in good health to work under the contract. Employees must not have "physical defects or abnormalities that would interfere with performing duties." All custody officers who work under the contract must pass a medical examination conducted by a licensed physician within 30 days prior to initial assignment, and AKAL must certify in writing that each custody officer satisfies eight categories of health requirements. These requirements include being "free from any serious physical illnesses, ailments, or maladies" and "mentally alert and emotionally stable with an absence of detectable neurotic or psychoneurotic conditions that would affect their ability to act during a stressful situation involving mental stress." AKAL must immediately report any changes in a custody officer's health status to the Contracting Officer's Technical Representative, who may require that the custody officer undergo a "fitness for duty" examination.

AKAL custody officers are members of the United Government Security Officers of America, a labor union. The collective bargaining agreement between the union and AKAL provides that shifts are awarded by seniority and custody officers may be required to work up to four hours of overtime per shift.

AKAL has an Anti-Harassment, Discrimination, and Retaliation policy that, among other things, prohibits discrimination based upon physical or mental disability. AKAL upholds all rights granted to employees under Title VII and other fair employment practice statutes.

On February 2, 2009, AKAL hired Dawson as a custody officer. Dawson was assigned to be a "floater," which mean that he could be assigned to any of three shifts.

1  On February 18, 2009, Dawson completed a "Floater Shift Preference" form and listed
2  his first preference as "swing," his second as "grave," and his third as "day."  Initially,
3  Dawson was placed on the swing shift; he worked that shift from February through May
4  2009 without incident.  On May 27, 2009, an armed custody officer was required on the
5  graveyard shift.  As a floater and an armed custody officer, Dawson was assigned the
6  graveyard shift.  After working the graveyard shift for one day, Dawson reported to his
7  immediate supervisor that he could not work that shift because he could not sleep during
8  the day.

9  　　As a result, on June 5, 2009, Dawson was placed on paid administrative leave,
10  pending the outcome of a fitness for duty evaluation based on Dawson's report of having
11  a sleep disorder that required an accommodation.  On June 9, 2009, Dawson was placed
12  on unpaid administrative leave.  AKAL's stated purpose in seeking a fitness for duty
13  evaluation was to ensure that Dawson's condition did not pose a danger to his co-
14  workers, ICE staff, detainees, or himself as each custody officer is expected to control the
15  physical actions of detainees.  On July 7, 2009, AKAL requested that Dawson undergo a
16  fitness for duty evaluation to be performed by MBI Healthcare clinic.

17  　　On July 16, 2009, AKAL received correspondence stating that Dawson had been
18  cleared to return to work in full capacity as of July 19, 2009, and had been instructed not
19  to work the graveyard shift due to a sleep disorder.  On July 24, 2009, AKAL received an
20  assessment from the fitness of duty evaluation that stated Dawson had a sleep disorder
21  and was unable to adjust to the night shift.  Thereafter, AKAL accommodated Dawson's
22  sleep disorder by allowing him to work the day or swing shifts.  On July 31, 2009,
23  Dawson signed an agreement that acknowledged the accommodation and stated that he
24  would work the mandatory four-hour overtime as required by the collective bargaining
25  agreement, but not work a full graveyard shift.  It appears that Dawson returned to work
26  on August 19, 2009.

On October 22, 2009, Dawson filed a Charge of Discrimination with the Arizona Attorney General's Office, Civil Rights Division, and the Equal Employment Opportunity Commission. On the Charge of Discrimination form, Dawson stated, in part:

> On or about June 5, 2009, Antunez place me on paid administrative leave. On or about June 9, the paid administrative leave was changed to unpaid, and, to date, I remain on this employment status.
>
> . . . .
>
> I believe I have been discriminated against because of my disability in violation of the Americans with Disabilities Act of 1990 (ADA), as amended, and retaliated against with unpaid suspension by Antunez for requesting a reasonable accommodation due to my disability.

The Charge of Discrimination does not mention AKAL's overtime requirement.

On March 4, 2011, Dawson filed his Complaint alleging disability discrimination and retaliation under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, and violation of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.* The Complaint alleges that Dawson suffers from a sleep disorder that meets the definition of "disability" as defined in 42 U.S.C. § 12102(2)(A), (B), and (C). Count One alleges that AKAL discriminated against Dawson by failing to accommodate his disability by refusing to allow him to continue working only day or swing shifts, forcing him to continue on unpaid leave when he had been released to return to work without restrictions other than the requested accommodation, and suspending his employment without cause to believe that any business necessity required this suspension. Count Two alleges that AKAL unlawfully retaliated against Dawson by demanding that he undergo unnecessary medical testing and suspending his employment. Count Three alleges that AKAL received federal funds as a federal contractor and its discrimination on account of disability also violates the Rehabilitation Act. The Complaint alleges that "Dawson has suffered a loss of earnings and benefits, as well as extreme frustration, emotional distress, humiliation and embarrassment" and seeks award of back pay to equal his loss of earnings and benefits during his suspension and other unspecified damages to be proved at trial.

**III.    Analysis**

    **A.    Counts One and Three:  Discrimination on the Basis of Disability**

The Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, prohibits an employer from discriminating against an individual on the basis of disability in the terms and conditions of employment by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such [employer]."  42 U.S.C. § 12112(a), (b)(5)(A).  The standards used to determine a violation of the Rehabilitation Act are the same as those applied under the ADA.  29 U.S.C. § 793(d).

Dawson alleges that AKAL discriminated against him by placing him on unpaid leave from June 9, 2009, until August 19, 2009.  AKAL's contract with ICE requires AKAL to ensure that each of its custody officers is in good health, does not have any physical defects that would interfere with performing duties, and is mentally alert.  AKAL must immediately report any changes in a custody officer's health status.  When Dawson reported to AKAL that he had developed a sleep disorder, of which he was unaware when he began his employment, AKAL had a contractual duty to ensure that Dawson was fully capable of performing the duties of an armed custody officer.  There is no evidence that the medical examinations were unnecessary.  Under these circumstances, seeking a fitness of duty evaluation before permitting Dawson to return to serving as an armed custody officer in an ICE detention center does not constitute discrimination.

In his response to the motion for summary judgment, Dawson also contends, apparently for the first time, that AKAL failed to engage in the interactive process required by the ADA.  The ADA imposes a mandatory obligation on employers:

> Once an employer becomes aware of the need for accommodation, that employer has a mandatory obligation under the ADA to engage in an interactive process with the employee to identify and implement appropriate

- 7 -

> reasonable accommodations. An appropriate reasonable accommodation must be effective in enabling the employee to perform the duties of the position. The interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees, and neither side can delay or obstruct the process.

*Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001) (internal quotation marks and citations omitted). Here, AKAL must have interacted with Dawson to reach the July 31, 2009 agreement that AKAL would exclude Dawson from graveyard shift assignment and Dawson would work up to 4 hours overtime per shift.

### B.     Count Two:  Retaliation

An employer may not retaliate against an employee who has opposed an employment practice that is unlawful under Title VII. 42 U.S.C. § 2000e-3(a). To show a prima facie retaliation claim, Dawson must produce evidence that (1) he engaged in a protected activity, (2) he suffered an adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action. *See Davis v. Team Elec. Co.*, 520 F.3d 1080, 1093-94 (9th Cir. 2008).

Dawson contends that placing him on unpaid administrative leave was an adverse employment action taken in retaliation for his requesting a reasonable accommodation. As found above, in order to fulfill its contractual obligations to ICE, AKAL was required to ensure that Dawson was in good mental and physical condition after he reported that he had developed a sleep disorder. Putting him on unpaid leave while evaluating his fitness for duty consitutes neither discrimination nor retaliation.

IT IS THEREFORE ORDERED that Defendant AKAL Security, Inc.'s Response to Plaintiff's Statement of Facts in Support of Response to the Motion for Summary Judgment (Doc. 19) is stricken. The Clerk shall leave the document imaged in the electronic record.

IT IS FURTHER ORDERED that Defendant AKAL Security, Inc.'s Motion for Summary Judgment (Doc. 15) is granted.

IT IS FURTHER ORDERED that the Clerk enter judgment in favor of Defendant and against Plaintiff and that Plaintiff take nothing.  The Clerk shall terminate this case.

DATED this 17th day of July, 2012.

_____
Neil V. Wake
United States District Judge

- 9 -